*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| IRMA E., | ) | |
| | ) | Supreme Court No. S-15003 |
| Appellant, | ) | |
| | ) | Superior Court Nos. |
| v. | ) | 3PA-11-00019/00020 CN |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 6841- November 22, 2013 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Vanessa White, Judge.

Appearances: Irma E., pro se, Wasilla, Appellant. Andy Harrington, Assistant Attorney General, Fairbanks, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.

## I.     INTRODUCTION

Irma E. asked the State Office of Children's Services to place her granddaughters with her, but OCS denied her request.[1] Irma then repeatedly asked the superior court to hold a hearing to review OCS's decision, but the superior court denied Irma's requests for a hearing. Based on AS 47.14.100(m), we conclude that a family member who has been denied placement of a child in OCS's custody is entitled to a review hearing to contest the OCS placement decision.

## II.    FACTS AND PROCEEDINGS

In January 2011, OCS took emergency custody of Irma's granddaughters, Nadia and Tia. The girls had been living with Irma, their maternal grandmother, while Nora, their mother, was homeless. OCS removed the girls from Irma's home because of allegations that Irma's son had been sexually abusing his own daughters and had sexually abused his younger sister when she was a minor. OCS was concerned because Irma allowed her son to remain in the home with Nadia and Tia after learning that he was being investigated by law enforcement officials for sexually abusing children. The superior court ultimately determined that the girls were children in need of aid based on Nora's stipulation that they had been placed at risk of sexual abuse. After several placements the girls were placed with a non-relative foster family.

Sometime before April 25, 2012, Irma asked OCS to place the girls with her. OCS denied Irma's request, stating that she had an unspecified prior history with their agency. Irma filed a request for a "review hearing on placement denial" with the superior court, using a form provided by the court system. She alleged that OCS's action was in error, and she offered to "show proof of this with audio and video." On July 3, 2012, the superior court denied Irma's request by checking a box on the request form

---

[1]     Pseudonyms are used for all family members and foster parents.

marked "DENIED. Good cause for a review hearing has not been demonstrated." The court did not otherwise explain its decision.

Irma apparently renewed her request with OCS, because on October 5, 2012, OCS sent her another denial letter. This letter listed numerous reasons for OCS's denial, including concerns that Irma's personality "place[s] her at risk to fail to appropriately protect the children." The letter referenced Irma's "co-dependent relationship with her adult children" including Nora, which in OCS's opinion rendered Irma's assurance that she would ensure the safety of her grandchildren "highly suspect."

On October 22, 2012, Irma filed a request with the superior court for a hearing on OCS's denial of her latest request for placement, again using a form provided by the court system. Irma alleged that OCS's denial was in error; she claimed to be in possession of new evidence, and she again offered to prove her point "with audio and video." In addition, she asserted that OCS employees had misused their power, broken the law, and lied. OCS had opposed Irma's earlier request for a hearing but filed a non-opposition to Irma's second request and itself requested "the opportunity to set the record straight at a contested hearing."

On November 8, 2012, the superior court began a trial to determine whether to terminate Nora's parental rights to Nadia and Tia. The court had intended to take up Irma's placement request on that date, but it did not do so because it had neglected to notify the parties. However, the court informed the parties that it intended to deny Irma's request for a hearing and that its sole reason for considering a hearing was OCS's request. The superior court then denied Irma's request for a hearing on the record, suggesting that Irma could renew her request if she supplied the court with facts to support her allegations against OCS.

Later that month, Irma renewed her request for a review hearing, again using a court system form, this time supporting her request with a letter to the superior

court in which she averred that she was capable of protecting Nadia and Tia from Nora, that she had obtained a domestic violence protective order against Nora, and that she had banned Nora from her home. On December 17, 2012, the superior court denied Irma's request by checking the box on the request form that indicated, "DENIED. Good cause for a review hearing has not been demonstrated."

Irma appealed to this court. We granted OCS's motion for a limited remand to allow the superior court to enter findings and conclusions in support of its decision to deny Irma's request for a hearing.

The superior court found that: (1) at the time of the girls' removal Irma was aware of the sexual abuse allegations against her son yet she continued to allow Nadia, Tia, and her son to reside together in the home; (2) Irma was uncooperative with OCS when the girls were removed; (3) Nora opposed Irma's request that the girls be placed with Irma; (4) Irma orchestrated the failure of the girls' foster placement by relaying to the foster parents threats that Nora had made from jail, and Irma's motivation had been to advance her prospects of having the girls placed with her; (5) Irma lacks insight into the girls' needs and into the harm her actions have caused the girls; and (6) Irma has a co-dependent relationship with Nora, which would cause any placement of the girls with Irma to be "confusing and destabilizing" to the girls.

In its conclusions of law, the superior court stated that it agreed with OCS's denial of Irma's request for placement because of Irma's "apparent failure to protect the two girls at the time of removal, coupled with her previous conduct that had resulted in [an] OCS investigation, and culminating with her manipulation of the girls' foster placement and their mother to achieve her own ends."

The main issue on appeal is whether the superior court properly denied Irma's request for a hearing to review the OCS decision to deny Irma's request that her granddaughters be placed with her.

## III. STANDARD OF REVIEW

This case requires us to interpret the child in need of aid statutes, which we do by applying our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[2]

## IV. DISCUSSION

### A. Alaska Law Provides An Adult Family Member Who Has Been Denied Placement Of A Child The Right To A Review Hearing.

Alaska law has long demonstrated a preference that children who are in OCS's custody be placed with family members. Before 2005, AS 47.14.100(e) provided that OCS could deny a request for placement by a child's "relative by blood or marriage" only after making "a determination, supported by clear and convincing evidence, that placement of the child with the relative will result in physical or mental injury."[3] A relative whose request for placement was denied by OCS had the right to de novo review of OCS's ruling by the superior court.[4]

In 2005 and 2006 the legislature amended AS 47.14.100(e) to provide, in relevant part, that when a child is taken into OCS's custody OCS must place the child, "in the absence of clear and convincing evidence of good cause to the contrary," (1) in the least restrictive setting that most closely approximates a family and that meets any special needs of the child, (2) within reasonable proximity to the child's home, considering any preferences of the child and the parents and any special needs of the

---

[2] *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004) (citing *S.S.M. v. State, Dep't of Health & Soc. Servs.*, 3 P.3d 342, 344 (Alaska 2000)).

[3] Former AS 47.14.100(e) (2004). The term "relative by blood or marriage" was not defined.

[4] *Id.*

child, (3) "with, in the following order of preference, (A) an adult family member; (B) a family friend . . .; (C) a licensed foster home . . .; (D) an institution for children . . . ."[5]

The amended subsection did not include the provision for de novo superior court review of OCS's denial of a request for placement. Instead, the legislation created a new subsection, AS 47.14.100(m), which provides that when OCS "denies a request for placement with an adult family member or a family friend, the department shall inform the adult family member or family friend of the basis for the denial and the right to request a hearing to review the decision."[6]

Thus, the legislature placed the burden on OCS to justify its denial of an adult family member's request for placement. If a judicial review hearing is requested, OCS must demonstrate that its decision is supported by clear and convincing evidence. The legislature gave a family member the right to request such a hearing, but did not impose a burden on the family member to show good cause.

The superior court in this case denied Irma's request for a hearing because of factual findings it made based on OCS's adjudication petition, log notes from the temporary custody and adjudication hearings, Nora's stipulations that the girls were children in need of aid (which were not Irma's stipulations), and Irma's testimony during

---

[5] The 2005 rewrite of the subsection required OCS to make "a showing of good cause to the contrary" when denying an adult family member's or a family friend's request for placement. Ch. 64, § 34, SLA 2005. The 2006 legislation amended the rewritten subsection to require OCS to have "clear and convincing evidence" of good cause to the contrary before denying an adult family member's or a family friend's request for placement. Ch. 20, § 8, SLA 2006.

"Adult family member" is defined as "a person who is 18 years of age or older and who is (A) related to the child as the child's grandparent, aunt, uncle, or sibling; or (B) the child's sibling's legal guardian or parent." AS 47.10.990; AS 47.14.100(t)(1). "Family friend" is not defined.

[6] Ch. 64, § 37, SLA 2005.

the trial to terminate Nora's parental rights. None of these sources provided Irma with the opportunities she would have been accorded had the superior court held an evidentiary hearing to review her claim that OCS had improperly deviated from the placement preferences provided by statute.

To the extent that the superior court denied Irma's request for a placement review hearing because Irma failed to show good cause for a hearing, the court's ruling was in error. On remand the superior court must provide Irma with the hearing to which she is statutorily entitled. At the hearing OCS, not Irma, will have the burden of demonstrating, by clear and convincing evidence, that its denial of Irma's request for placement was justified. Irma must be allowed the opportunity to confront OCS's evidence against her and to present her position that OCS's decision was in error.[7]

**B.      Irma's Request Does Not Involve An Adoptive Placement.**

The State argues that the superior court should have treated this matter as an adoption proceeding under AS 47.10.088(i) rather than as a CINA placement proceeding under AS 47.14.100(e). Under AS 47.10.088(i) OCS must approve an adult family member's request to adopt a child "unless there is good cause not to approve the adoption." Unlike placement requests made under AS 47.14.100(e), where the

---

[7]      On appeal, the State argues, in part, that we should uphold the superior court's decision because "[a] substantiated child protection services history can constitute evidence of good cause to bypass the adult family member priority for either foster care or adoptive placement," Irma's "unwillingness to cooperate with OCS established good cause to bypass the adult family member priority for either foster care or adoptive placement," and " 'co-dependency' between the adult family member and the CINA parent(s) can constitute good cause to bypass the adult family member priority for either foster care or adoptive placement." We express no opinion on the merits of these arguments because the factual findings required to support them were not properly arrived at by the superior court. The State will have an opportunity to present evidence and to argue those points on remand.

controlling standard is clear and convincing evidence, OCS may deny an adult family member's request for adoption based on a mere preponderance of evidence.[8]

The State argues that Irma's request for placement should have been treated as a request for adoption for several reasons: (1) AS 47.10.088(i) requires OCS to "identify, recruit, process, and approve a qualified person or family for an adoption whenever a petition to terminate a parent's rights to a child is filed," and OCS filed its petition to terminate Nora's parental rights to Nadia and Tia before Irma asked the superior court to review OCS's denial of her second and third requests for placement; (2) in December 2011, OCS changed its proposed permanency goal for the girls to a primary goal of adoption with a concurrent goal of reunification (the superior court approved this goal in February 2012); and (3) Irma stated in a letter to the superior court that she was "asking to adopt" her granddaughters.

The State likens this case to *Tununak*, where we determined that the superior court properly construed a placement request made in a CINA proceeding as a request for adoption. In that case we noted that "even though the placement determination took place in the context of a CINA proceeding, it is clear that the parties were essentially contesting — and the superior court was essentially determining — adoptive placement."[9] But important factors distinguish *Tununak* from the present case.

---

[8] *Native Vill. of Tununak v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 303 P.3d 431, 444-45 (Alaska 2013). The review hearing provision of AS 47.14.100(m) applies to requests for adoptive placement made under AS 47.10.088(i) as well as to requests for CINA placement made under AS 47.14.100(e).

[9] *Id.* at 443.

In *Tununak*, an adoption proceeding was pending in the superior court when the court determined the child's placement.[10] The child's foster parents, with whom the child had been living for more than two years, had filed a petition to adopt the child before the placement question was resolved.[11] The superior court did not consolidate the adoption and CINA cases, but it stayed the adoption proceeding pending resolution of the CINA placement issue and it "stated that the future adoption proceeding would be dependent on the placement ruling in the CINA case."[12] The superior court stated that the party contesting OCS's placement decision would not be allowed "two bites at the apple," by first contesting placement in the CINA proceeding and then, if it lost that challenge, by contesting placement in the adoption proceeding.[13] As we noted, the superior court's order "denied the Tribe's objections to adoptive placement and cleared the way for the Smiths to adopt Dawn."[14] Thus, it was clear in that case that the issue being contested at the placement review hearing was the child's placement for adoption.[15]

---

[10]  *Id*. at 433.

[11]  *Id*. at 435.

[12]  *Id*. at 435, 443.

[13]  *Id.* at 443.

[14]  *Id*. at 439.

[15]  The Smiths' adoption of Dawn was finalized a few months after the superior court issued its decision approving the Smiths as Dawn's placement. *Id.* at 439-440. We note that in an analogous case, *C.L. v. P.C.S.*, 17 P.3d 769, 772 (Alaska 2001), a foster care placement morphed into an adoptive placement when the superior court terminated the parents' parental rights and the children's foster parents filed petitions to adopt the children.

In the present case no adoption proceeding has been initiated. Neither Irma nor the girls' foster parents have filed an adoption petition or otherwise taken steps toward adopting the girls. At the conclusion of the termination trial on December 5, 2012, the superior court terminated Nora's parental rights to the girls. At the time, the court approved the girls' recently changed foster family as a CINA placement, in the process noting that because the children had been placed with the new family for only a short time their placement could not yet be considered a placement for adoption.[16] On remand the superior court should consider Irma to have asked OCS to place the children with her for CINA purposes under AS 47.14.100(e), not as having asked OCS to approve her adoption of the children.

C.      **The State's Remaining Arguments Are Unavailing.**

The State argues that res judicata or equivalent principles of finality bar Irma's appeal of the superior court's December 17, 2012 denial of her request for a hearing because Irma did not appeal from the superior court's July 3, 2012 or November 8, 2012 denials of her requests for hearing. But OCS did not raise this issue in the superior court, nor did that court rely on this reasoning when it denied Irma's second or third requests for hearing.[17] Instead, the court stated that Irma could renew her request if she provided factual support for her allegations of OCS wrongdoing, which she

---

[16]      The superior court stated that it was approving the girls' new home "as a permanent placement, but I don't think anybody is so cavalier or foolhardy as to think, well, we're going to immediately petition for adoption in this case, when the children have only been in that home for a few weeks." The court noted that its decision was not intended as a decision on Irma's placement motion, which was not yet ripe. At a hearing in January 2013 the superior court noted that adoption continued to be the appropriate permanency goal for the girls, but that its decision whether their existing placement was appropriate for adoption remained months away.

[17]      Indeed, OCS itself requested a judicial hearing on Irma's second request for placement.

claimed to have done later that month. In addition, OCS's denial of Irma's second request for placement was based on different considerations than its denial of her first request.[18] Thus, OCS's assertion that circumstances were unchanged from one request to the next conflicts with its own assertions in decisional documents.

There may be some merit to the State's argument that a family member should not receive multiple hearings on the same placement request. But we have noted that courts should proceed cautiously when applying doctrines of finality in children's cases because "the circumstances in a child's life are ever-changing and . . . the court's focus must be on the child's welfare."[19] Here, Irma did not receive a review hearing on any of her requests. Under these circumstances, we conclude that res judicata did not bar Irma's most recent request for a hearing.

Finally, the State argues that we should affirm the superior court's denial of Irma's request for a review hearing because Irma's allegations would not be sufficient to overturn OCS's placement decision. We reject this argument. As noted above, the burden at a placement review hearing is on OCS to justify its denial of an adult family member's request for placement; the burden is not on the adult family member to prove that OCS's denial was erroneous.

Furthermore, the State incorrectly characterizes Irma's challenge to OCS's decision as only involving her history in an OCS case concerning children other than

---

[18]    OCS's letter denying Irma's first request stated as its sole ground that Irma had a "prior CPS history that was substantiated." Its letter denying Irma's second request contained a half-page recitation of grounds, including concerns about Irma's personality, her alleged co-dependent relationship with her adult children, her willingness and ability to protect the children from Nora, and her having allegedly relayed to the foster parents threats that Nora had reportedly made against them.

[19]    *Kent V. v. State, Dep't of Health & Soc. Servs.*, 233 P.3d 597, 601 (Alaska 2010).

Nadia and Tia.[20] One of the main factors upon which both OCS and the superior court relied in this case was Irma's purported co-dependent relationship with Nora, and her perceived inability or unwillingness to protect the girls from Nora. Irma clearly intended to challenge that factor when she informed the court that she had obtained a protective order against Nora, had banned Nora from her home, and had not allowed Nora to have unsupervised contact with Nadia and Tia's biological older sibling, a child whom Irma had adopted.[21]

## V. CONCLUSION

For the foregoing reasons, we REVERSE the superior court's order denying Irma's request for a placement review hearing and REMAND this matter to the superior court with instructions to hold a hearing to review the OCS decision.

---

[20] We agree with the State that the record in the present case "contains scant evidence about the proceedings in that separate case." Should the parties deem such evidence relevant to Irma's request, they may present it to the superior court on remand.

[21] We agree with the State that Irma did not adequately brief her summary argument that Nadia and Tia should be placed in Irma's home because of the presence there of the girls' biological sibling — Irma's adopted son — and we therefore decline to address that argument.